MAC ADRIAN v. ARTHUR L. EDSTROM, SPECIAL
ADMINISTRATOR FOR ESTATE OF
EUGENE JAMES VALESKI.

229 N. W. 2d 161.

May 2, 1975—No. 44873.

*Altman, Geraghty, Mulally & Weiss* and *James W. Kenney,* for appellant.

*Norton, Jergens, Hebert & Cass, John V. Norton,* and *William E. Jepsen,* for respondent.

Heard before Otis, MacLaughlin, and Knutson, JJ., and considered and decided by the court en banc.

MACLAUGHLIN, JUSTICE.

This is a negligence action by plaintiff, Mac Adrian, against defendant, Arthur L. Edstrom, special administrator for the estate of Eugene James Valeski, arising out of a two-vehicle accident on November 2, 1972. Valeski, who died as a result of the accident, ran a red light with his automobile and struck the pickup truck driven by plaintiff. Plaintiff brought this action for, among other things, loss of earnings and future earning capacity, permanent injuries, and pain and suffering. A jury returned an award of $50,650 to plaintiff. Defendant, who does not contest Valeski's negligence, appeals from the denial of his motion for a new trial or, in the alternative, a remittitur, and from the judgment for plaintiff. We affirm.

At the time of the accident, plaintiff was 58 years old, married, and the father of 11 children of whom only two were claimed as dependents for income tax purposes in 1972. Plaintiff, a self-employed farmer, owned an 80-acre farm near Hastings and rented an additional 140 acres which he farmed in connection with his own 80 acres. He was also employed part-time as a truck driver for a hardware store at the rate of $2 per hour and worked as a plumber and well digger and repairer on a part-time basis

from which he earned $10 per hour. As a truck driver he was required to load, haul, and unload freight.

Prior to 1938, plaintiff worked as a steamfitter's helper in St. Paul. Thereafter, he worked for Cudahy Packing Company as a steamfitter until 1955. After that time he went into business for himself as a well digger and began his farming, which continued up to the time of the accident. Plaintiff testified, without objection, that he did not have a steamfitter's license at the time of the accident but that such a license was available to him.

Evidence at the trial, taken most favorably to plaintiff, reveals that he suffered a cervical sprain which aggravated preexisting arthritis and that the condition is permanent. As a result of the accident, plaintiff has been unable to continue his employment as a truck driver due to a limitation in the amount of work he can perform and weight he can lift; and his part-time plumbing, well digging, and repair work has been restricted. Plaintiff has been greatly restricted in the work he can perform on his farm and has had to limit his farming to the 80 acres owned by him and has hired neighbors to help farm those 80 acres. His wife, son, and two neighbors testified that plaintiff's activities were limited as a result of the accident.

Plaintiff has used a home traction device on a regular basis, often has severe headaches after activity, and continues to have considerable pain and discomfort in his neck and shoulder area.

The principal issues on appeal are (a) whether the trial court erred in permitting the opinion testimony of a witness as to the loss of earning capacity of plaintiff; (b) whether the trial court erred in admitting into evidence and sending to the jury room an exhibit which summarized certain figures testified to by the earnings witness; and (c) whether the damages granted plaintiff are excessive.

■ Arval Christensen of the Minnesota State Employment Service in St. Paul was called by plaintiff as an expert witness to testify to the loss of earning capacity incurred by plaintiff as a result of the accident. Christensen began working for the

State Employment Service in 1961. At that time he was an unemployment insurance adjuster, but went on to become a unit supervisor and a section supervisor in which capacity he supervised 20 employment interviewers. He was then promoted to employability services supervisor in charge of all counselors involved in the placement of the handicapped. At the time of the trial, he was the operations supervisor in charge of all types of employment placement.

Christensen testified that he was familiar with the qualifications required by employers of job applicants and that he had interviewed plaintiff to determine his employability in the local labor market. Christensen said he had considered the age, education, health status, and previous work history of plaintiff. Christensen then testified that, assuming good health and considering plaintiff's experience, plaintiff could be expected to earn from $5 to $8 per hour in "farming, installing pumps, repairing pumps, plumbing, and steam fitter." Christensen took an average of $6.50 per hour and estimated plaintiff's future earning capacity at $13,524 per year. The witness then testified that in his opinion, and based upon plaintiff's present physical condition, age, and education, he could not "think of a single employer that would hire this man even though he was willing to work." However, he went on to testify that, assuming plaintiff could find a job, the most he could expect to earn would be approximately $2.50 per hour or $5,200 per year. He concluded that plaintiff's loss of earning capacity was the difference between $13,524 per year and $5,200 per year or $8,324.

Defendant argues that this testimony was without proper foundation principally because plaintiff was not licensed as a steamfitter at the time of the accident and had not worked as such for several years, and because Christensen was not fully informed of plaintiff's earnings in years previous to the accident.

It is largely within the discretion of the trial court to determine whether an adequate foundation has been laid to qualify a witness as an expert. Lovejoy v. Minneapolis-Moline Power

Implement Co. 248 Minn. 319, 79 N. W. 2d 688 (1956). We have carefully reviewed Christensen's testimony, and the facts upon which his opinions were based, and conclude that this discretion was not abused. Plaintiff had worked in farming, trucking, well digging, and plumbing during the years immediately preceding the accident. It is true that he had not worked as a steamfitter for 18 years, and did not have a steamfitter's license, although he testified, without objection or contradictory evidence, that he could obtain a steamfitter's license upon application. Significantly, however, our review of Christensen's testimony reveals that he placed little emphasis on the steamfitting aspect of plaintiff's future earning capacity.

The following testimony is relevant to the question of the weight Christensen placed upon steamfitting in determining the $6.50 hourly wage which, in his opinion, plaintiff could have reasonably expected to receive in the future:

"Q. Now, * * * would you state your opinion as to what jobs would be available to Mr. Adrian, assuming good health?

"A. Assuming good health, I would go back to where he has had his experience and where his best qualifications are, which, of course, are farming, installing pumps, repairing pumps, plumbing, and steam fitter.

"Q. Okay. Now, what wage range would they fall into?

"A. This would run into a range from $5.00 to $8.00 an hour.

* * * * *

"A. Between $5.00 and $8.00 an hour, an average of six and a half dollars an hour."

On cross-examination Christensen testified as follows:

"Q. Now, as far as the steam fitting job, did you determine whether or not he had a current license?

"A. No, sir, I did not.

"Q. Well, wouldn't the party having a current license be a factor if you were to place someone, or attempt to place someone in a steam fitter's job?

"A. Certainly.

"Q. It would be a prerequisite, wouldn't it, in this type of market?

"A. That's right.

"Q. And as far as plumbing, wouldn't an individual have to have a plumbing license?

"A. That's right.

"Q. All right. So that absent a plumbing license, you wouldn't be able to put a 59-year-old man in good health into the plumbing field?

"A. Well, certainly down in Hastings we would. He would continue as he has been doing for years in plumbing and installing wells. I didn't have plans of bringing him back into St. Paul to do these types of work.

"Q. Well, are you saying a plumber would get $5.00 to $8.00 an hour, between $5.00 and $8.00 an hour?

"A. What I said was the types of work that he was qualified to do, such as farming, installing pumps, plumbing, et cetera. He would make between $5.00 and $10.00 an hour. In fact, * * * when he was in this business, he used to charge $10.00 an hour.

* * * * *

"Q. In your $8.00 an hour, what job classification did you have in mind for that?

"A. Installing pumps.

"Q. And that would be in the Hastings area?

"A. Hastings area, St. Paul area. The Hastings area is in the labor market of the St. Paul area.

"Q. Would he be able to install pumps in the St. Paul area?

"A. I don't believe they install pumps right in the St. Paul area. But for the sake of your question, let's leave it around the Hastings area."

From the quoted testimony, it is clear that Christensen based his estimate of $5 to $8 per hour for future earnings of plaintiff principally upon farming, plumbing, and installing and repairing pumps. He testified that the top figure of $8 was based upon

installing pumps and pointed out that in the past plaintiff had charged $10 per hour for this type of work.

On the basis of the record, we have concluded that if any error occurred in the consideration of steamfitting it was nonprejudicial and certainly not such as to require a new trial.

Likewise, while evidence as to plaintiff's past earnings was vague and uncertain,[1] it appears that there was sufficient and competent evidence upon which Christensen could base his opinion. Christensen testified that he had considered the age, personal background, education, health status, and previous work history of plaintiff. He also testified that he had taken a financial history of plaintiff's earnings as a truck driver and had gone into the question of his farm income. He also was familiar with the hourly rate that plaintiff obtained as a plumber. He did not, however, have a complete financial history of plaintiff's earnings from all sources.

We have held that it is not essential that prior earnings of a plaintiff be shown before damages based on impaired earning capacity may be awarded. However, it is clear that plaintiff must establish by a fair preponderance of the evidence the extent to which such impairment is reasonably certain to occur. Fifer v. Nelson, 295 Minn. 313, 204 N. W. 2d 422 (1973); Berg v. Gunderson, 275 Minn. 420, 147 N. W. 2d 695 (1966). While a more complete earnings history would have been appropriate and helpful, it appears from the record that there was sufficient and competent evidence on which Christensen could base his opinion.

■ While Christensen was testifying to figures representing plaintiff's earning capacity, plaintiff's attorney, without objection, made a written summary of the figures on a transparency which was projected on a screen for viewing by the jury. At the conclusion of Christensen's direct testimony, this transparency was marked as an exhibit and offered into evidence. The exhibit

---

[1] Income tax returns introduced at trial are for the most part incomplete and lacking in specific income figures.

was admitted over defendant's objection, and defendant claims its admission was reversible error.

Minn. St. 546.15 provides:

"On retiring for deliberation, the jury may take with them all papers received in evidence except depositions; but the court may direct that copies be made for their use of such records and documents as ought not, in its judgment, to be taken from those entitled to their possession. The jurors may also take with them notes of the testimony and proceedings made by themselves, but none others. All such papers, except the notes aforesaid, shall be returned to the clerk before the jurors are discharged."

Defendant argues that the transparency, which essentially contains only the figures set out above allegedly representing plaintiff's future loss of earning capacity, is in the nature of a deposition because it constitutes the preservation of one witness' testimony over others and should not have been admitted into evidence or been taken by the jury when they retired for their deliberations. Defendant cites Skinner v. Neubauer, 246 Minn. 291, 74 N. W. 2d 656 (1956), which held it was error for the jury to take a deposition into the jury room. However, this exhibit is obviously not a deposition, nor do we consider it sufficiently akin to one to be precluded by the statute. Therefore, if the exhibit was correctly admitted into evidence, it was within the trial court's discretion to send it into the jury room pursuant to § 546.15. Of course, the trial court, on its own motion or at the instance of counsel, for good cause, could have withheld or restricted by proper instructions the use of this exhibit by the jury. Jensen v. Dikel, 244 Minn. 71, 69 N. W. 2d 108 (1955). The record submitted to this court, however, does not disclose that defendant requested that the exhibit be withheld from the jury or that a precautionary instruction be given to the jury.

In Koolish v. United States, 340 F. 2d 513 (8 Cir.), certiorari denied, 381 U. S. 951, 85 S. Ct. 1805, 14 L. ed. 2d 724 (1965), in which the issue was the use by the government of certain charts

and summaries which were admitted into evidence, the court stated as follows:

"* * * The charts and summaries referred to were based upon substantial evidence introduced by the government through its own witnesses or in cross-examination of the defendants' witnesses. All were subject to cross-examination or re-examination by defendants' counsel. The jury was very carefully and fully instructed as to their use. We find no error in their receipt. The admission of charts and summaries is a matter which rests largely within the sound discretion of the trial court and its action in receiving the disputed charts and summaries may not be reversed by an appellate court unless such discretion be abused." 340 F. 2d 533.

While it would not have been error for the trial court to have denied admission of the summary into evidence, or to have specifically instructed the jury as to the limited use of the exhibit, we hold that there was no abuse of discretion in its admission.

■ Defendant claims the verdict of $50,650 is excessive and that the trial court erred in not granting a remittitur. The record discloses the following facts regarding damages incurred by plaintiff:

(a) He suffered a cervical sprain which has aggravated a prexisting arthritic condition, and there is competent medical testimony that the condition is permanent.

(b) There was considerable testimony that plaintiff was greatly restricted in the work he could perform around his farm and that he had been forced to discontinue the rental of the additional 140 acres adjacent to his farm which, prior to the accident, he had farmed in connection with his own 80 acres. Plaintiff testified that he has had to hire neighbors to assist him in farming his own 80 acres.

(c) Plaintiff has been unable to continue his employment as a truck driver due to the limitations on the amount of work he can perform and the weight he can lift.

(d)  Plaintiff testified that he has been considerably restricted in his plumbing work because of his restrictions on lifting.

(e)  Plaintiff testified that he has been considerably restricted in his well-repair activities because he is not able to do the lifting and other work associated with it.

(f)  Plaintiff testified that he continues to have difficulty sleeping, has been required to use a home traction device on a continuing basis, has had severe headaches after attempting to work, and has been required to take medication for pain continually up to the time of trial. He testified that he has considerable pain and discomfort in his neck and shoulder area.

We have frequently held that the question of whether a verdict should be set aside as excessive is largely within the discretion of the trial court, that the trial court has the duty to keep the jury within the bounds of reason, and that the facts of each case must serve to measure damages. Fifer v. Nelson, *supra*; Young v. Hansen, 296 Minn. 430, 209 N. W. 2d 392 (1973); Cameron v. Evans, 241 Minn. 200, 62 N. W. 2d 793 (1954).

While we agree with the comment of the trial court that the verdict was liberal, we do not believe it was a result of passion or prejudice or that it is unjustified by the evidence. The jury no doubt considered plaintiff's past, present, and future pain and discomfort; the likelihood that there was a degree of permanency involved in his injuries; the effect of those injuries on his future earning capacity and, indeed, on his ability to obtain future employment of any kind; and his medical expenses, past and future. Taking all of this into consideration, we cannot say the trial court erred in refusing a new trial or a remittitur.

■  The only other issue raised by defendant which requires comment is the claim that plaintiff appealed to the sympathy of the jury by making certain references during the course of the trial to the fact that one of plaintiff's children had recently died. We have examined those occurrences and are convinced that they arose in the normal course of the trial without any intention on the part of plaintiff to improperly appeal to the sympathy

of the jury. In the absence of intentional or unconscionable efforts to promote such a reaction by the jury, we do not believe that the references to the deceased child justify a new trial or a remittitur of the verdict.

Other issues raised by defendant on this appeal have been carefully considered and found to be insufficient to justify a new trial.

Affirmed.

Following oral argument, Mr. Justice Otis took no part in the consideration or decision of this case.