THEODORE M. DeWITT v. BARBARA H.
SCHUHBAUER AND OTHERS.
DAYTON COMPANY, APPELLANT.

177 N. W. (2d) 790.

June 5, 1970—No. 42108.

*Stearns, Goetteman & Narveson, Harry S. Stearns, Jr.,* and *James M. Goetteman,* for appellant.

*David W. Thurston,* for plaintiff respondent.

*Thomas J. Battis* and *Murnane, Murnane, Battis, deLambert & Conlin,* for defendant respondents.

Heard before Knutson, C. J., and Nelson, Sheran, Peterson, and James F. Murphy, JJ.

James F. Murphy, Justice.*

Defendant Dayton Company appeals from an order denying its motion for a new trial or for judgment notwithstanding the verdict.

It appears from the record that on March 31, 1967, defendant driver, Mrs. Schuhbauer, was proceeding west on Sixth Street in St. Paul. She turned her vehicle north into the Dayton Company parking ramp entrance on Sixth Street. She was familiar with the parking ramp and entrance, having parked there on about 15 previous occasions, and knew the location of the sidewalk area which she was crossing.

The sidewalk upon which plaintiff was walking is immediately adjacent to the south wall of Dayton Company's depart-

---

*Acting as Justice of the Supreme Court by appointment pursuant to Minn. Const. art. 6, § 2, and Minn. St. 2.724, subd. 2.

ment store. It is 18 feet wide and Dayton's store extends over it. There are pillars spaced along the south edge of this covered sidewalk. The pillars are 18 feet from the north curb of Sixth Street. Cars enter the Dayton parking ramp by driving over the sidewalk. There were no signs, markings, or warnings to pedestrians walking on the sidewalk under the overhang indicating that cars cross the sidewalk to enter Dayton's parking ramp.

Plaintiff, 61 years of age at time of accident, was a pedestrian walking in a westerly direction on the sidewalk in the area adjacent to Dayton's when he was struck by defendant driver. His injuries will be discussed subsequently herein. Defendant driver claims that at the time of the accident she was driving about 8 miles per hour. It was a bright day, and she claims she was blinded for a second or two as she left the bright sunshine and entered the shaded area of the parking ramp entrance. As a result, she claims, she did not see plaintiff coming from the right until he was in front of her car, when it was too late to avoid the accident.

The court submitted findings of fact to the jury in the form of interrogatories. The jury found that defendant Dayton Company was negligent, that such negligence was a direct cause of the accident, and that plaintiff and defendant driver were not negligent. Pursuant to these findings the court ordered judgment in favor of plaintiff and against defendant Dayton Company in the sum of $35,000, the amount to which the jury found plaintiff to be entitled.

Dayton Company has submitted three issues on appeal. They will be taken up in the order in which they were raised.

■ It is first claimed by defendant Dayton Company that defendant driver, Barbara H. Schuhbauer, was negligent as a matter of law. We must reject this contention. The only excuse defendant driver gives for not seeing plaintiff is that she was momentarily blinded as she entered the dark, shaded area of the ramp's entrance. Dr. Edward C. Emerson, a licensed and practicing physician and surgeon who was called as a witness in be-

half of defendant driver, stated that the eye must adjust to different intensities of light and that the pupil of the eye has to dilate when one leaves a bright area and enters a dark area. This takes a period of time, and sometimes there is a lag of a few seconds before the pupil dilates. During this period, one would have difficulty seeing, he said. From these facts it would appear that defendant driver was not negligent as a matter of law and that her conduct was a question for the jury's determination. Ordinarily, negligence is a jury question. Here, the triers of the facts could have found her negligent in her failure to observe the plaintiff; on the other hand, they could have found her not negligent and excused her from not seeing plaintiff due to temporary blindness. There appears to be no similar fact situation in Minnesota cases. However, we have held in a number of cases that one temporarily blinded by oncoming headlights is not negligent as a matter of law for not seeing what would otherwise have been in plain sight. Brown v. Raymond Bros. Motor Transp. Inc. 186 Minn. 321, 243 N. W. 112; Johnson v. Kutches, 205 Minn. 383, 285 N. W. 881; Shaber v. St. Paul, M. & M. Ry. Co. 28 Minn. 103, 9 N. W. 575; Williams v. Larson, 140 Minn. 468, 168 N. W. 348. This court said in Duff v. Bemidji Motor Serv. Co. 210 Minn. 456, 459, 299 N. W. 196, 198, where darkness had set in and confusion was probably caused by headlights, that a jury "could reasonably infer a lack of negligence" on the driver's part, "[b]linded as he probably was by the headlights of defendant's truck."

Surely, the facts now before the court created a jury issue on the question of negligence on the part of defendant driver.

The second issue is whether defendant Dayton Company was free of negligence as a matter of law at the time of the accident. We believe the issue of negligence on the part of Dayton Company created a jury question.

Defendant company constructed a specially covered passageway in place of a regular sidewalk. It used the sidewalk as an entryway into its parking ramp. It erected large pillars between

the sidewalk and Sixth Street, which blocked pedestrians' view of the street and moving traffic, particularly traffic turning to cross the sidewalk to enter the parking ramp. The automobile traffic over the sidewalk was heavy. On the day of the accident 565 cars crossed it, and 19,475 cars crossed during March 1967. The use of the sidewalk by defendant company was for its benefit. The trial court in instructing the jury on the issue of negligence on the part of defendant Dayton Company said:

"In this case it is admitted that the defendant, The Dayton Company, operated a parking ramp pursuant to a license for such operation granted to it by the City of St. Paul. In return for the right to operate this ramp and make such use of the public sidewalk as it does, that defendant incurs certain responsibilities. The defendant, its managers and employees, are under an affirmative duty to exercise ordinary and reasonable care to protect the safety of those pedestrians using the public sidewalk adjacent to their parking ramp. As a part of such duty there is imposed upon the defendant the responsibility of taking reasonable precautions to prevent those acts which, in connection with its operation, the defendant ought, in the exercise of ordinary care, to anticipate or foresee will likely occur and which are liable to result in injuries to those to whom the defendant owes the duty.

"Thus, in determining whether or not the defendant, The Dayton Company, breached the duty which it owed to those using the public sidewalk, you may, among others, consider the factors of what acts, if any, should reasonably have been anticipated by this defendant and what, if any, precautions should reasonably have been taken by this defendant in anticipation of acts or occurrences that should reasonably have been anticipated."

We believe the instruction states the law of Minnesota. From it the jury could have found defendant company negligent in not properly warning pedestrians of the hazard of cars entering the parking ramp.

We believe that in the instant case the use of the sidewalk as a ramp over which some 500 cars passed on the day of the accident was an extraordinary use of the sidewalk and that the instruction given above was a correct statement of the applicable law.

We said in Graalum v. Radisson Ramp, Inc. 245 Minn. 54, 60, 71 N. W. (2d) 904, 909:

"An extraordinary use of an adjacent sidewalk arises when, in the light of all the circumstances of the particular case, such use is not only for the personal convenience and benefit of the abutting occupant but is also of such a nature, in *kind* or in *degree,* that a condition is created which interferes with, and is in derogation of, a normal use of the sidewalk by the public. The liability arises not from the fact that the defendant is the owner or occupant of the property abutting on the sidewalk, but from the fact that he has, wilfully or negligently, been instrumental in causing the hazardous condition which gives rise to a duty which the law imposes upon him. * * * An extraordinary use may also arise from acts which, though intrinsically consistent with the usual function of a sidewalk or driveway when conducted in a normal manner and context, lose their customary status because they are performed in such unusual volume and under such conditions that they unduly interfere with a safe and normal use of the affected portion of the sidewalk. Vehicular travel over a sidewalk to an abutting occupant's place of business may, periodically or otherwise, become so heavy that a sidewalk ceases to perform its normal function as a reasonably safe route for pedestrian travel. Such use is abnormal in degree rather than in kind although the circumstances of a particular case may involve both phases."

Here, the large volume of incoming and outgoing traffic to and from the ramp over a sidewalk which was shaded or darkened by the overhead building imposes upon defendant company, for whose convenience and benefit the vehicular traffic over the

sidewalk is permitted, an affirmative duty to exercise ordinary care for the safety of pedestrians.

Taking, as we must, the evidence in the light most favorable to the verdict, we find the evidence to be sufficient to create a jury issue on the question of negligence on the part of defendant company. Loewe v. City of Le Sueur, 277 Minn. 94, 151 N. W. (2d) 777.

■ The final issue raised in the appeal involves the claim that the damages were excessive and were the result of passion and prejudice, contrary to the evidence.

The facts reveal that plaintiff, age 61 at the time of accident, had been in reasonably good health previous to March 31, 1967. In the accident he sustained a fracture of the plateau of the tibia. He was confined to the hospital from March 31 to May 12, 1967. At first he was treated by traction. On April 21 he underwent an operation for the repair of the fracture, removal of cartilage, and insertion of a pin to stabilize the knee joint. Bone was grafted from his hip to support the knee joint. Upon conclusion of the operation, the left extremity was encased in a cast from toe to hip until July 12, 1967. From the time of his discharge from the hospital on May 12, 1967, until October 25, 1967, he was required to use crutches to remain ambulatory. He experienced much pain and at time of trial related that the pain in his knee was the same as it had been when he was hospitalized 2 years earlier. Medical testimony was that he had a permanent disability of the leg. Previous to the accident plaintiff had worked as a press operator earning $4.50 per hour, although in the 2 years immediately preceding the accident his employment was sporadic. After the accident he tried to seek employment but experienced pain and therefore could not be steadily employed. For a short time he was employed as a dishwasher earning $1.50 per hour. Medical testimony indicated that the job he had as a dishwasher in a restaurant was not suitable for him and that any job which required continual standing or which required him to move or lift things was not the best type of occupation because

of the disability. His life expectancy is 15 years. He will continue to have pain. The special medical damages amounted to $2,323.70, with probable future medical expenses of $300. The jury awarded $35,000 as total damages, including past and future pain and suffering, loss of income, and loss of future earning capacity.

The trial court in its memorandum stated:

"The amount of damages awarded to plaintiff is unquestionably liberal, perhaps substantially higher than this Court would have found; but, that is not the test. Taking into consideration all of the facts of the case as the jury apparently found them to be, plus the inflated state of the economy, it cannot be said that the amount 'shocks the conscience.' "

Ordinarily, the question of whether a motion for a new trial on the ground of excessive damages should be granted or whether the verdict should be reduced rests in the practical judgment and sound discretion of the trial court. In reviewing the order of the trial court disposing of such a motion, this court will be guided by the general rules applicable to discretionary orders, and the order will not be reversed unless such discretion has been abused. Ott v. Tri-State T. & T. Co. 127 Minn. 373, 149 N. W. 544; Flemming v. Thorson, 231 Minn. 343, 43 N. W. (2d) 225.

In view of plaintiff's injuries, the pain he has suffered in the past and will suffer in the future, his life expectancy, his inability to follow his usual occupation, and the inflation referred to by the trial court, we do not believe the award of the jury, although liberal, so greatly exceeds that which is adequate as to cause us to set it aside on the ground that it was awarded as the result of passion and prejudice.

Inasmuch as the trial court's order is affirmed, it is not necessary to consider the issue, raised by plaintiff respondent's notice of review, of the propriety of the trial court's refusal to give a requested instruction relating to Minn. St. 169.31.

Affirmed.

Mr. Justice Otis took no part in the consideration or decision of this case.